RECEIVED
IN LAKE CHARLES, LA
OCT 2 0 2011
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| UNITED STATES OF AMERICA | : | DOCKET NO. 2:04 CR 20144 |
|---|---|---|
| VS. | : | JUDGE MINALDI |
| JONATHAN LEE VERNIER | : | MAGISTRATE JUDGE KAY |

### MEMORANDUM RULING

Presently before the court is the defendant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Rec. Doc. 109). The Government filed an Answer (Rec. Doc. 124). The defendant filed a Reply. ( Rec. Doc. 128).

Procedural History[1]

On December 14, 2005, a federal grand jury returned a superseding indictment charging the defendant with one count of carjacking resulting in death, in violation of 18 U.S.C. § 2119. (Rec. Doc. 30). On March 31, 2008, the defendant filed a request for specific discovery. (Rec. Doc. 46).

Just before jury selection on April 7, 2008, defense counsel, Assistant Public Defender Wayne Blanchard, advised the Court that the defendant wanted to represent himself at trial. The Court denied the defendant's request. After four days of trial the jury returned a guilty verdict on the one count of the superseding indictment. (Rec. Doc. 65).

On October 1, 2008, the defendant filed *pro se* motions for self representation, for downward

---

[1] As summarized by the government.

1

departure and for Wayne Blanchard to withdraw as attorney of record. (Rec. Docs. 70-72). On October 10, 2008, the defendant was sentenced to a term of life, which is to run consecutively to the undischarged term of imprisonment imposed by the State of Colorado and by the U.S. District Court in Miami, Florida. (Rec. Doc. 74). On October 10, 2008, the Court issued oral orders granting the motion for self representation as to Vernier, denying the motion for departure from the sentencing guidelines and granting the motion to withdraw as attorney. (Rec. Doc. 74).

On October 29, 2008, a motion to appoint counsel was filed by the defendant. (Rec. Doc. 79). On February 4, 2009, the Court issued an order granting the motion to appoint counsel. The Office of the U.S. Public Defender was appointed to represent the defendant on direct appeal. (Rec. Doc. 86). The record indicates that Christopher Aberle accepted the appointment. (Rec. Doc. 87).

On June 9, 2010, the United States Court of Appeals for the Fifth Circuit affirmed the defendant's conviction. The issue on appeal was whether or not the defendant had been unconstitutionally denied his right to self- representation. (Rec. Doc. 106). On November 15, 2010, the Supreme Court of the United States denied the defendant's petition for a writ of certiorari. (Rec. Doc. 107).

On April 29, 2011, the defendant filed a motion to vacate, set aside or correct sentence under 28 U.S.C. § 2255. (Rec. Doc. 109). He also filed a motion for discovery, a motion to expand the record, and a motion for recusal. (Rec. Docs. 112-114).[2]

Facts[3]

On April 19, 2003, Jonathan Vernier escaped from a prison facility in Golden, Colorado,

---

[2] The court has issued separate rulings on these motions.

[3] As summarized by the Government.

where he was serving a sentence for car theft. (2 T. 23-27)[4]. Vernier intended to flee to Mexico by stealing a succession of cars and driving them until they ran out of gas. (2 T. 135).

While Vernier was traveling towards Mexico, Ran Mesika, a young Israeli citizen who was in the United States on a tourist's visa, was driving eastward across the country in a blue van. (1 T. 30, 40-41, 55, 57). Mesika had acquired the van from Ran Sinai, an Israeli businessman in San Diego, California. (1 T. 38, 77). Sinai had provided Mesika with $123,000 worth of jewelry on consignment, which Mesika intended to sell as he traveled across the United States. (1 T. 30, 42, 44, 58).

Mesika's parents, who were in Israel, were aware of their son's trip across the United States. (1 T. 30, 78). Mesika's father provided him with a credit card for emergencies. (1 T. 35-36, 53, 68, 78). Mesika's parents and friends had almost daily telephone contact with Mesika. (2 T. 31, 50, 65, 76, 79).

On approximately April 29, 2003, Jonathan Vernier was hitchhiking near Waco, Texas when Mesika stopped and offered Vernier a ride. (2 T. 121). Right from the start, Vernier began formulating a plan to attack Mesika and steal the van and its contents. He also planned to steal Mesika's identity to facilitate his escape. (2 T.126; 3 T. 48-49). Vernier and Mesika traveled together for about four days and slept in the van in Wal-Mart parking lots. (2 T. 121, 122).

Early on the morning of May 2, 2003, Mesika and Vernier shopped at a Wal-Mart store in Lake Charles, Louisiana. (2 T. 86-92). At that point Vernier decided to complete his plan. (3 T. 49). When the two men left the store and returned to the van, Vernier attacked Mesika and struck him with a four-way tire iron that was inside the van. (2 T. 124-125; 3 T. 49, 112-113).

---

[4] "T" is used to designate the trial transcripts.

3

With the victim still alive in the back of the van, Vernier proceeded to drive to convenience stores and gas stations to withdraw money from ATM's with Mesika's credit card. (2 T. 93-102, 127; 3 T. 49). The defendant conducted two successful and one unsuccessful ATM transactions and withdrew several hundred dollars. (2 T. 98; 3 T. 38, 49). The defendant then decided to actually kill Mesika. (2 T. 130; 3 T. 48, 50).

Vernier exited the highway near Jennings, Louisiana, to dispose of the body. (3 T. 50, 109). After he had disposed of Mesika's body, Vernier resumed his trip and utilized Mesika's identity and credit card to obtain cash and lodging. (2 T. 129; 3 T. 50). In Mississippi, Vernier burned Mesika's clothing as well as the bedding from the van, which were all heavily stained with blood. (2 T. 131, 135). Vernier also used a pressure washer at a car wash to attempt to clean the blood from the back of the van. (2 T. 128).

Vernier drove the van towards south Florida and attempted to avoid any encounters with police. (3 T. 50). He replaced Mesika's picture on an Israeli identification document with his own and continued to use Mesika's identity and credit card as he traveled. (2 T. 132; 3 T. 31, 51).

During this time, a report of Mesika's possible kidnaping had been made to the FBI, and agents from south Florida and south Louisiana had begun investigating the case and tracking the then-unknown subject through the use of the credit card. (2 T. 84-85; 3 T. 6). Special Agent Richard Lunn, who was based in Homestead, Florida, and local law enforcement agents interviewed gas station clerks along the Florida coast and eventually tracked the subject to Key West. (2 T. 70; 3 T. 51).

On May 13, 2003, FBI Special Agents in Key West were advised by local authorities that a blue van which had been associated with the subject they were looking for had been spotted at Leo's

Campground in Key West. (2 T. 35, 70-71). The agents eventually approached Vernier, displayed their credentials, advised him that he was under arrest, and tried to restrain him. (2 T. 36-37, 72). However, Vernier led the agents on a lengthy chase and struggled before he was finally arrested. (2 T. 78).

Subsequent forensic examination of the blue van confirmed that blood and human tissue found inside the van and on a tire iron recovered in the van contained DNA that matched Ran Mesika's profile. (3 T. 23-24, 34-36, 78-86). Examination also confirmed that Vernier's fingerprints were present inside the van. (3 T. 61-67). The amount of blood present in the van as well as the blood spatter pattern was consistent with a massive loss of blood and a violent assault. (3 T. 17, 19, 21). Forensic examination of the van did not reveal the presence of any blood containing Vernier's DNA profile. (3 T. 86). Because investigative agents had been unable to find Mesika's body,"America's Most Wanted" was permitted to air a television show about the case in an effort to obtain additional leads. (3 T. 47). Vernier saw that show while he was incarcerated in a Colorado prison, and in November of 2004, contacted a local FBI agent, Richard Price, with a request to speak to investigators. (2 T. 113; 3 T. 47). In connection with that request, Vernier provided Agent Price with a two-page letter in which he set forth a series of demands, including the payment of a $100,000 cash reward, in exchange for information on the location of Mesika's body. (2 T. 113, 118-120).

On November 30, 2004, FBI Special Agent Joe Duenas, and Special Agent Richard Lunn traveled to Colorado to speak to Vernier. (2 T. 112; 3 T. 46). Vernier gave them a lengthy statement confessing to the murder, carjacking, and unauthorized use of Mesika's credit card and identity. (2 T. 121-135; 3 T. 47-54). However, Vernier intentionally mislead the agents regarding the time of Mesika's death and, thus, caused them to look in the wrong place for the body. (3 T. 123).

In May of 2005, in an effort to secure the reward offered by the victim's family for the recovery of his body, the defendant placed two collect telephone calls to Equasearch, a private organization providing assistance in the recovery of missing persons. (3 T. 90-92). On July 1, 2005, after the defendant had been indicted on federal charges (but before the superceding indictment), the government forwarded the defendant a plea agreement in another effort to find the body for the family of the victim. (Exh. 1).On September 19, 2005, the defendant did make a statement to Agent Duenas in the presence of his attorney. (Presentence Report "PSR", para. 20)[5]. However, the PSR provides information concerning the disposal of the body near Donaldsonville which was false. (PSR, para. 27).

On April 10, 2008, after the verdict, agents interviewed the defendant twice. He gave them a detailed description of where he placed the victim on May 2, 2003, near Iowa, Louisiana. (PSR, para. 21). Eventually after an extensive search, the remains of the victim were located. (PSR, para. 22).

Law

Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice.[6]

"A 'collateral challenge may not do service for an appeal.' " *United States v. Shaid*, 937 F.2d

---

[5] The defendant objected to this paragraph in the PSR because the statement described was made during plea negotiations. The PSR was revised. See Addendum. However, the facts listed in this paragraph are described to provide a context for the defendant's arguments concerning this statement made in September of 2005.

[6] *United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir.1992).

228, 231 (5th Cir.1991) (en banc). A defendant who raises a constitutional or jurisdictional issue for the first time on collateral review must show "both 'cause' for his procedural default, and 'actual prejudice' resulting from the error." *Id.* at 232. The 28 U.S.C. § 2255 cause and actual prejudice standard presents a significantly higher hurdle than the plain error standard of review that is applied on direct appeal. *United States v. Pierce,* 959 F.2d 1297, 1301 (5th Cir.1992).

The only exception to the cause and prejudice test is the "extraordinary case ... in which a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* Actual innocence means "factual innocence, and not mere legal insufficiency." *Bousley v. United States,* 5423 U.S. 614 (1998). To prove actual innocence, the petitioner "must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Id.* (citations and quotations omitted). Significantly, the government "is not limited to the existing record to rebut any showing that petitioner might make." *Id.* at 1611-12. Vernier admits killing Mesika, but submits that he fled the scene before stealing Mesika's van. He presumably is arguing that, because Mesika was already dead, he could not be guilty of carjacking (the offense of conviction) when he returned and stole the van. Vernier has introduced nothing to "affirmatively prove that he is probably innocent." *See Carriger v. Stewart,* 132 F.3d 463, 476 (9th Cir.1997) (en banc). Neither has Vernier demonstrated that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.

Vernier asserts four grounds for his §2255 motion:

1) Vernier asserts that his conviction was based on inadmissible evidence, the Government violated the plea agreement and Judge Minaldi's pretrial ruling concerning that plea agreement, and the tainted testimony violated Fed. R. Evid. 410.

7

2) Ineffective assistance of counsel by both trial and appellate counsel.

3) The evidence at trial did not support a carjacking with intent conviction.

4) The Government violated *Brady v. Maryland* when it withheld videotape evidence.

## Grounds 1, 3, and 4

Vernier raises several issues apart from his ineffective assistance of counsel claims. These issues will be discussed first.

Vernier submits that he made two statements to the FBI. One was made in Colorado on November 30, 2004, and the other was given in Lake Charles, Louisiana, on September 19, 2005. Vernier states that he attempted to negotiate a plea agreements, but that attempt failed and the second statement was made during a failed plea negotiation. Vernier contends that, at a pre-trial hearing, the undersigned ruled that since the September 19, 2005, statement was made during plea negotiations, it could not be used at trial. Attached to his Memorandum in Support of his motion as Exhibit 1, Vernier attached pages 5 and 6 from a purported plea agreement. Vernier does not provide a transcript of the alleged ruling on the motion, nor does he give the date that such a ruling was made. Vernier argues that the Government breached the plea agreement when FBI Agent Duenas testified that the defendant told him of finding an area in some woods "near a power line or possibly a pipeline" where he began to dig a grave. The docket sheet in this case does not indicate that such an order limiting testimony was ever issued. The defendant asserts that this allegedly inadmissible statement was used against him at trial.

Vernier next asserts that the evidence submitted was insufficient to support a conviction for

carjacking. He alleges that, at best, the Government introduced evidence that a fight took place between him and Mesika.

Vernier also contends that the Government failed to produce evidence that he alleges would have proved that he did not commit the carjacking, namely missing video-tapes from Wal-Mart.[7] Vernier asserts that he killed Ran Mesika first, fled and then returned to steal the vehicle. The defendant asserts that the Government did not produce all of the videos from the Wal-Mart parking lot.[8]

The Government responds that, except for the ineffective assistance of counsel claim (discussed hereinafter), the issues raised by Vernier in this motion are procedurally barred. The Government asserts that the defendant cannot now raise issues such as the alleged breach of Fed.R. Evid. 410, sufficiency of evidence and alleged violations of *Brady*. Even if these are constitutional arguments, the Government posits that they should have been raised on direct appeal and that the defendant is merely attempting to circumvent the procedural bar by raising them in the context of ineffective assistance of counsel claims.

To show cause for a procedural default, a movant must "show that 'some objective factor external to the defense' prevented him from raising on direct appeal the claim he now advances." *United States v. Guerra*, 94 F.3d 989, 993 (5th Cir.1996) (citation omitted). Vernier's allegations do not establish "cause" for his procedural default, *see id.*, and this court finds no waiver of the

---

[7] The Government produced two videotapes. There is no evidence that any others existed.

[8] This argument was discussed in a separate ruling denying the defendant's post-conviction motion for discovery.

procedural bar by the Government. Vernier is required to demonstrate actual prejudice by demonstrating "not merely that the errors ... created a possibility of prejudice, but that they worked to his actual and substantial disadvantage." *Hughes v. Quarterman,* 530 F.3d 336, 341 (5th Cir.2008) (internal quotation marks and citation omitted). Vernier does not address, much less show, prejudice, and the issue is therefore waived. *See Yohey v. Collins,* 985 F.2d 222, 225 (5th Cir.1993). Because Vernier fails to overcome the procedural bar, he is not entitled to relief. *United States v. Robinson,* 323 Fed.App'x. 340, 342 (5th Cir. 2009).

### Ground 2 - Ineffective Assistance of Counsel

To prevail on an ineffective-assistance-of-counsel claim, Vernier must satisfy the two-part test enunciated in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, Vernier must demonstrate that his attorney's performance fell below an objective standard of reasonableness. *Strickland,* 466 U.S. at 687. The Fifth Circuit has described that standard as "requiring that counsel research relevant facts and law, or make an informed decision that certain avenues will not be fruitful." *Conley,* 349 F.3d at 841 (internal quotation marks and citations omitted Second, Vernier must also prove that he was prejudiced by his attorney's substandard performance. *Strickland,* 466 U.S. at 687. "[T]o prove prejudice, [Vernier] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Conley,* 349 F.3d at 841 (internal quotation marks and citations omitted); *United States v. Herrera,* 412 F.3d 577, 580 ( 5th Cir. 2005).

A § 2255 motion is not a substitute for a direct appeal. A prisoner may not raise a claim for

the first time in a collateral attack unless he shows cause for his procedural default and actual prejudice resulting from the error. *United States v. Shaid*, 937 F.2d 228, 231–32 (5th Cir.1991) (en banc); *see also United States v. Frady*, 456 U.S. 152, 167, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Although Vernier does not directly address why his procedural default should be excused, he does argue that his trial and appellate counsel were ineffective. A petitioner can establish cause and prejudice by showing that counsel rendered constitutionally-ineffective assistance. *See United States v. Patten*, 40 F.3d 774, 776 (5th Cir.1994); *United States v. McGrew*, 397 Fed.App'x. 87, 91 (5th Cir. 2010).

Vernier makes several claims that he asserts constitute ineffective assistance of counsel.

The defendant claims that the Government violated Fed.R.Evid. 410 and Fed.R.Crim.P. 11 by referring to statements which the defendant made during plea negotiations. He asserts that his attorney was ineffective for failing to object. He further asserts that his appellate attorney refused his request to raise this issue on appeal.

As the description of the facts demonstrates, the defendant had made several statements to law enforcement. On November 30, 2004, Agents Duenas and Lunn interviewed the defendant. On September 19, 2005, Agent Duenas interviewed the defendant in the presence of the defendant's attorney. This interview was a result of a plea agreement perfected by the parties.

The Government asserts that the description in the report written by Agent Duenas of the defendant's September 19, 2005 statement has some details not mentioned in the report describing the defendant's November 30, 2004 statement. For instance, the account of the September 19, 2005 statement included descriptions of the defendant's placing the body in a shallow grave. When Agent

Duenas was testifying at trial, he did mention that detail. (2 T. 131). However, he indicated that he was testifying about the interview on November 30, 2004. (2 T. 114).

Nevertheless, the Government argues that contrary to the defendant's allegation, the assumption cannot be reached that he was testifying about the statement made on September 19, 2005. As Agent Lunn testified, not all of the information gathered by agents is necessarily included in FBI Form 302 ("302"). (3 T. 57). Therefore, Agent Duenas may have been testifying from his recollection of the November 30, 2004 statement and not from the report prepared after the September 19, 2005 statement.

The defendant also points to Agent's Lunn's references to facts which the defendant claims were only mentioned in the September 19, 2005 statement, such as details concerning the shallow grave and pipe line road. Agent Lunn was not present at the interview on September 19, 2005. He testified that he was basing his trial testimony on a "302 that was done by Joe Duenas and assisted by me, and I used my memory of that interview." (3 T. 56). Agent Lunn stressed that the "302 does not have to report every single thing that was heard." (3 T. 57). Again, not all testimony was necessarily based on the 302. Furthermore, Agent Lunn was not present at the September 19, 2005 statement; therefore, he would not have been testifying on the basis of the report prepared after that interview. The facts he related would have been based on his recollection of the interviews in which he participated such as the one on November 30, 2004. As he mentioned, not all of the information obtained would necessarily have been in the 302. Therefore, the Government submits that both agents could have been recalling what they heard on the date of the interview on November 30, 2004, regardless of whether those details were in the 302 or not.

Nevertheless, even if the agents had inadvertently referred to material from the interview on September 19, 2005, there was no deleterious effect on the defendant. In light of the significant evidence against the defendant, this one fact would not have affected the verdict.

This court is persuaded that the defendant's attorney's failure to object was not ineffective assistance of counsel. The defendant has not established that Fed.R.Evid. 410 was violated. Furthermore, without a close examination of both of the reports, it would have been difficult to discern the difference in those details. The failure to object was reasonable since objecting may have emphasized the fact that the defendant had lied to law enforcement about the location of the body on numerous occasions.

Vernier has not established that the failure to object was not a strategic trial decision. *Strickland*, 104 S.Ct. at 2065-66. The Fifth Circuit has made it clear that counsel is not required to make futile motions or objections,[9] so the failure to do so is not ineffective assistance of counsel.

Vernier also argues that Mr. Blanchard was ineffective because he asked no questions of 18 of the 22 witnesses offered by the Government. Vernier asserts that Mr. Blanchard asked a total of 43 questions throughout the trial and this is, he argues, evidence of ineffectiveness.

Vernier also submits that Mr. Blanchard offered no defense to the carjacking charge, he did not subpoena requested Wal-Mart employees and made no objections.

Again, failure to object, ask questions, introduce witnesses are all strategic decisions made by defense counsel. Given the almost infinite variety of trial techniques and strategies available to counsel, this court must be careful not to second guess legitimate strategic choices which may now,

---

[9] *See Murray v. Maggio,* 736 F.2d 279, 283 (5th Cir.1984) (per curiam).

in retrospect, seem questionable or even unreasonable. The Fifth Circuit has stressed that, "great deference is given to counsel, 'strongly presuming that counsel has exercised reasonable professional judgment.'"[10]

Next, the defendant asserts that his attorney operated under a conflict of interest because the family of the victim visited him at his office and asked him to help them find the body of the victim. He points to questions that the attorney asked him during direct as examples of the attorney's attempt to discover the location of the body.

*Strickland* offers a superior framework for addressing attorney conflicts outside the multiple or serial client context.[11] *Cuyler*, like all the other Supreme Court cases that have discussed a lawyer's conflict of interest, solely concerned the representation of multiple clients. The Supreme Court has not expanded *Cuyler*'s presumed prejudice standard beyond cases involving multiple representation. Although lower courts have generally extended *Cuyler* to "duty of loyalty" cases, their decisions have not grappled with the difficulties inherent in that position, and the Fifth Circuit has found their reasoning inconsistent. The demands and reasoning of legal ethics militate against treating multiple representation cases like those in which the lawyer's self-interest is pitted against the duty of loyalty to his client. *Beets v. Scott*, 65 F.3d 1258, 1265-1266 (5th Cir. 1995). Therefore, applying *Strickland*, the defendant must establish the presence of a conflict which prejudiced him.

---

[10] *Martin v. McCotter*, 798 F.2d 813, 816 (5th Cir. 1986), *cert. den.*, 107 S.Ct. 934, 479 U.S. 1056, 93 L.Ed.2d 985 (1987).

[11] *Cuyler v. Sullivan*, 446 U.S., at 345-350 has been routinely applied to cases in which an alleged attorney conflict resulted from serial representation of criminal defendants as well as simultaneous multiple representation. *See, e.g., Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).

The defendant has failed to show either a conflict or prejudice.

Neither has Vernier presented new evidence sufficient to support a new trial. Rule 33 permits the district court to vacate judgment and grant a new trial "if the interest of justice so requires." Fed.R.Crim.P. 33; *see United States v. McBride*, 862 F.2d 1316, 1319 (8th Cir.1988) (the interest of justice standard "requires the district court to balance the alleged errors against the record as a whole and evaluate the fairness of the trial."). A trial court should not grant a motion for new trial unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict. *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir.1997). A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant. *United States v. Rasco*, 123 F.3d 222, 228 (5th Cir.1997).

Motions for new trial based on newly discovered evidence are "disfavored and reviewed with great caution." *United States v. Erwin*, 277 F.3d 727, 731(5th Cir.2001). As a general rule, there are five prerequisites (typically referred to as the *Berry* rule) that must be met to justify a new trial on the ground of newly discovered evidence. The defendant must prove that (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence if introduced at a new trial would probably produce an acquittal. *Id.* at 231-32. If the defendant fails to demonstrate any one of these factors, the motion for new trial should be denied. *United States v. Freeman*, 77 F.3d 812, 817 (5th Cir.1996). All evidence listed by Vernier was known by the defendant at the time of the trial. The court is not persuaded by the defendant's various arguments concerning this evidence. Therefore, a new trial is not warranted.

Accordingly, for the reasons stated herein, the defendant's §2255 motion will be DENIED.

Lake Charles, Louisiana, this 19 day of ~~September~~ October, 2011.

*/s/ Patricia Minaldi*
PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE